[Cite as *In re K.M.*, 2020-Ohio-4476.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| K.M. and A.M. | : | Case No. 20CA4 & 20CA6 |
| | : | |
| Adjudicated Dependent Children. | : | DECISION AND JUDGMENT ENTRY |

_____

APPEARANCES:

Dennis Kirk, Hillsboro, Ohio, for Appellants.[1]

Anneka P. Collins, Highland County Prosecuting Attorney, and James Roeder, Assistant Prosecuting Attorney, Hillsboro, Ohio, for Appellee.

_____

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED: 9-9-20
ABELE, J.

{¶ 1} This is an appeal of a Highland County Common Pleas Court, Juvenile Division, judgment that granted Highland County Children Services (HCCS), appellee herein, permanent custody of K.M. and A.M., the biological children of father S.M. and mother R.T., appellants herein.

{¶ 2} Appellants assign two errors for review:

FIRST ASSIGNMENT OF ERROR:

THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN. THE COURT'S BEST INTEREST ANALYSIS WAS AGAINST THE MANIFEST WEIGHT OF

---

[1] Different counsel represented appellants during the trial court proceedings.

THE EVIDENCE.

SECOND ASSIGNMENT OF ERROR:

THE CASE EXCEEDED THE STATUTORY 90 DAY TIME PERIOD FOR INITIAL DISPOSITION AND SHOULD HAVE BEEN DISMISSED.

{¶ 3} On April 3, 2018, appellee filed a complaint and a motion for emergency temporary custody. The complaint alleged K.M. and A.M. to be neglected, abused, and dependent children. The complaint averred that HCCS received a report in early April 2018 that the children's biological father, S.M., overdosed in his home in the presence of his minor children, then ages three and four. The complaint also alleged that, on April 2, 2018, the children's biological mother, R.T., reported to HCCS that she uses heroin daily and she needs help. The complaint further averred that both S.M. and R.T. lost their jobs, anticipated disconnection of electric service, and could not pay their rent. The agency could not identify any appropriate care givers for the children and implemented Juv.R. 6. On April 3, 2018, the trial court issued an order for emergency care.

{¶ 4} In separate hearings in May and June 2018, appellants waived their right to a contested adjudicatory hearing, admitted the facts as outlined in the amended complaint as true, and admitted the children were dependent. On May 29, 2018, the trial court issued an entry that reset disposition and stated, "[b]oth parents waived the 90 day dispositional requirement if the same could not be timely set."

{¶ 5} On August 2, 2018, appellants agreed HCCS should have temporary custody of the children through April 3, 2019. The trial court's entry stated that, pursuant to R.C. 2151.353(A)(2), temporary custody of the children be vested in HCCS for one year, to

automatically terminate on April 3, 2019 unless a timely motion is filed with the court.   Among other orders, the court ordered a home study of E.S., the maternal grandmother.   On October 4, 2018, E.S. moved to join as a necessary party and requested legal custody.   On March 26, 2019, HCCS filed a motion to extend temporary custody and set the matter for an annual review hearing.

{¶ 6} On April 1, 2019, the trial court held a hearing to consider E.S.'s motion for legal custody.   HCCS Caseworker Melissa Lipp testified that in April 2018, the court issued an emergency shelter custody order for the children due to an overdose in their home.   Among other requirements, R.T.'s case plan required her to complete a psychological evaluation, an alcohol and drug assessment, a mental health assessment, submit to random drug screens, meet her caseworker bi-weekly face to face, and obtain stable housing and employment.   Lipp explained that although R.T. completed the psychological evaluation, she did not obtain stable housing or employment.   Lipp testified that R.T. is not compliant with counseling, and has not been in contact with HCCS since January 16.   Lipp also stated that R.T. often visits the children weekly for two hours, but has not substantially remedied the conditions that caused the children's HCCS placement.

{¶ 7} Concerning the father (S.M.), Caseworker Lipp testified that his case plan required the same as R.T., but he does not have stable housing or employment, and he is currently incarcerated for a positive drug screen probation violation.   Lipp stated that S.M. visited the children weekly until his incarceration, but did not substantially remedy the conditions that caused the children's placement with HCCS.   Lipp also testified that, during her visit at E.S.'s home, she observed padlocks on interior doors, including K.M. and A.M.'s bedroom.   E.S.

explained that the locks were "to keep people out." Lipp stated that E.S.'s husband, Ray, and her mentally disabled adult son, Michael, also live in the home, and Michael had not completed appellee's request for a psychological assessment.

{¶ 8} Highland County Kinship Coordinator Jamie Miller visited the E.S. home on August 7, 2019. Miller testified that E.S. told her they used the padlocks to secure medication and for her son's privacy. Miller also testified about the multiple contacts E.S. had with HCCS between 1976 and 2005. Miller explained, "[E.S.] was named the alleged perpetrator on an indicated physical abuse in February of 1995; and was named the caretaker on six separate cases with her children." Miller further testified that in 1987, HCCS investigated an allegation that a family friend sexually abused one of E.S.'s children. HCCS, however, closed that investigation "due to [E.S.] withdrawing [that child] from counseling," even though "counseling services were needed." In 1988, HCCS received another report about the same child. In 1990, E.S. permanently surrendered one of her children. In 1992, HCCS received a report of sexual abuse of the same child from the 1987 and 1988 allegations. In 1994, HCCS investigated an allegation that R.T.'s father physically and sexually abused R.T. HCCS closed that case "with [E.S.] refusing to cooperate with the Agency." In 1997, HCCS investigated an allegation that E.N., another child of E.S., was pregnant with the child of E.S.'s husband's son. The son "was basically under house arrest. He did reunify with the home, and the case was closed." In 2002, HCCS received information that an uncle sexually abused R.T., but they closed that case "due to lack of corroboration." In 2003, appellee investigated another allegation of sexual abuse involving R.T. In 2005, HCCS investigated a claim that another of E.S.'s children, K.S., intentionally cut herself. Appellee closed that case because E.S. refused services. Miller also

testified to 12 calls from E.S.'s home to the Greenfield Police Department from 2012-2017.

{¶ 9} Appellant, R.T., the children's mother, testified that she is 27 years old and lives with her sister, E.N. She began to abuse drugs at age 13, has 8 siblings, and believed that her mother, E.S., did the best she could to protect her during childhood. R.T. stated that in June 2018 she attended the Lynn Goff Rehabilitation Center for 36 days, but did not complete the program. She testified she is currently sober, has no income, and has a pending case in Greenfield County Court. R.T. testified that she wanted her mother to have custody of her children because "[s]he won't keep my kids from me. She'll give 'em back * * * [o]nce I finish my counseling."

{¶ 10} Highland County Job and Family Services Supervisor Amanda Barrera testified that she met R.T. and E.S. in late April 2018, when they came to the office to discuss E.S. taking custody of the children. R.T. told Barrera that she had a strained relationship with E.S. from trauma she suffered during childhood, but they were trying to mend the relationship.

{¶ 11} E.N., R.T.'s sister, testified that E.S. did not abuse her, did everything she could to protect her during childhood, and that she has entrusted E.S. with her own six children.

{¶ 12} R.S. (Ray) testified that he is married to E.S. and explained that his son, who is "I'm gonna guess 32," "was diagnosed with something, but I don't remember what it is." He described his son as loving toward K.M. and A.M. When asked about the padlocks, Ray said they were for security and to secure household cleaners. Ray also testified that he has another son against whom he has a restraining order. Ray acknowledged that he contacted law enforcement multiple times in 2017 when his son trespassed and threatened him, but he has not been a problem since 2017. Ray also acknowledged that his son "has been locked up for the last

six months."

{¶ 13} Appellant, S.M., the children's father, testified that he supported the award of the children's legal custody to E.S. S.M. stated that E.S. cared for them from birth, and that he and R.T. occasionally lived with E.S. S.M. testified to his various drug-related convictions and pending charges, and stated that at the time of the hearing he is on probation in a treatment in lieu of conviction program.

{¶ 14} E.S. (grandmother) testified that she and Ray, married for 22 years, live with her disabled adult son, who is not violent. E.S. stated that she has a strong bond with K.M. and A.M., enjoys playing with them, and attends with R.T. the weekly visitation. E.S. receives SSI and believes that she and her husband can financially support the two children. E.S. explained that she would take classes or go to counseling, but that HCCS told her that "no matter what" she did, she "wasn't gettin' those kids."

{¶ 15} E.S. also stated that her first child was "taken" by HCCS, and then five years later told her "if I did not sign those adoption papers, they were taking [E.N.]. They gave me no choice but to sign 'em, to safe [sic] my other child. And that's what I did." E.S. testified that in 1987, her aunt's boyfriend "was trying to touch [E.N.]," and when E.N. told her about the abuse, E.S. took E.N. to the police station, but "Children's Services slapped me on the wrist." E.S. testified that in 1988, Ray's stepson assaulted E.N. at their home. When asked about a 1994 report that R.T. "was physically and sexually assaulted by her father," E.S. stated, "[t]hat's not true." When asked about a 2002 report that an uncle sexually assaulted R.T., E.S. stated that it occurred in Ashland County, that she cooperated with authorities, and that after the incident R.T. received counseling. When asked about a 2003 allegation that another perpetrator

assaulted R.T., E.S. replied, "That one didn't happen," and explained that it was a misunderstanding. When asked about the 2005 self-harm incident that involved her stepdaughter, K.S., E.S. stated that she took her to counseling, but she would hide and refuse to go, so they stopped going.

{¶ 16} E.S. acknowledged that Ray's adult son has repeatedly visited their home, despite the restraining order. She also acknowledged that her daughter, E.N., and her husband's son, S.S., step-siblings, had a child together.

{¶ 17} Guardian Ad Litem Jacob Wagoner testified that he was both legal counsel and GAL for the minor children. Wagoner stated that E.S.'s home was appropriate, other than the padlocks being "odd." Wagoner also testified about his concerns about K.M. and A.M.'s young ages, particularly in light of E.S.'s multiple contacts with HCCS, including the sexual abuse allegations. Wagoner stated, however, that he would feel comfortable with the children in E.S.'s temporary custody, but with the agency retaining legal custody. Wagoner also added that neither parent made progress on their case plan.

{¶ 18} On April 2, 2019, the trial court issued an entry that 1) denied appellee's motion to extend temporary custody of K.M. and A.M. for up to an additional six months, and 2) denied E.S.'s motion for legal custody. Also on April 2, 2019, HCCS filed a motion for permanent custody. The court set a hearing for June 3, 2019, and, on April 3, 2019, removed E.S. as a party to the action.

{¶ 19} The trial court held a hearing on June 3, 2019, and on June 10, 2019, granted S.M.'s motion for extension, with temporary custody with HCCS for six months, to terminate on October 3, 2019. The court indicated that R.T. did not appear for the hearing even though she

received service.  On September 17, 2019, HCCS filed another motion for permanent custody. On November 27, 2019, R.T. requested one final 6-month extension to complete her case plan, which the court granted.

{¶ 20} At the trial court's February 7, 2020 permanent custody hearing, Highland County Department of Job and Family Services Director Melissa Wheaton testified that she is responsible for the Family Advocacy Center, where parenting time occurs.  Wheaton stated that R.T. (mother) attended 42 of 89 visits, played with the children, brought occasional gifts, and has been affectionate.  Wheaton did describe one visit when one child became ill and R.T. then complained about cleaning up after the child.

{¶ 21} Director Wheaton also testified that S.M. (father) attended 50 of 85 visits, had four "no-shows," has been tardy, fell asleep on the couch during visits, brought a knife to a visit, smoked on the property, used foul language and ate a staff member's food without permission. However, Wheaton stated that S.M. is bonded with the children, plays with them, and brings things in preparation for the visits.

{¶ 22} Foster parent Heather Schaff testified that she lives with K.M. and A.M, along with her husband, Jason, and their two daughters, ages 15 and 18.  Schaff stated that they attend church as a family and K.M. and A.M. cheer.  The children speak to their father on the phone about once per week, and the children "always say they miss mommy and daddy.  Yeah, they say that a lot. - And grandma and grandpa. * * * They say that they want to go home, that's what they tell me, to both parents."  Schaff explained that although she and her husband are "considering" adopting the children, "right now, obviously our goal is reunification.  So, if that does change and occur, then that would be something we would be interested in."  She did clarify that if the

court granted HCCS permanent custody, she and her husband would pursue adoption.

{¶ 23} HCCS Caseworker Melissa Lipp testified that she served as the caseworker from October 2018 to August 2019, but did not prepare the original case plan. Lipp testified that although R.T. completed a drug and alcohol assessment, she did not complete treatment. In addition, Lipp explained that R.T. did not obtain employment or suitable housing, and had "very minimal" contact with the agency. "We did not know * * * her whereabouts * * * until she was arrested." "[R.T.] would always say that she was gonna get it together. * * * But that she was using. There was times that she admitted to just using. She admitted to using more, uh, after the kids were removed than ever before."

{¶ 24} Caseworker Lipp testified that S.M. had the same case plan requirements and although he completed a 90-day drug and alcohol treatment program, he did not complete the psychiatric evaluation, he lived with his grandmother, and he did not obtain employment. Lipp further explained that S.M. was inconsistent in maintaining face-to-face contact with HCCS. Finally, Lipp testified about S.M.'s March 25, 2019 and August 26, 2019 positive drug screens for amphetamine and methamphetamine, and noted that the August 26 test occurred after S.M. completed his treatment. Apparently, authorities arrested S.M. the day after he completed treatment.

{¶ 25} HCCS Caseworker Sharon Mick took over as the children's caseworker on September 1, 2019. Mick stated that S.M. did not complete any drug treatment since then, still lived at his grandmother's home, and had a positive drug screen for amphetamines and methamphetamine on September 12, 2019. Mick also testified that S.M. refused a drug screen in October 2019 when she visited the jail. Mick noted that S.M. had a negative January 2020

screen, but the Washington Court House Municipal Court recently cited S.M. for drug paraphernalia.

{¶ 26} Caseworker Mick also testified that R.T. attended an in-patient treatment in lieu of conviction program, lives in transitional housing, has not obtained suitable housing or employment, and admitted that she drank alcohol and took methamphetamine during the weekend of January 10, 2020 while on a 48-hour leave from her in-patient program. Mick stated that R.T. requested phone time with the children, but the first two times did not have a number for them to call, and the last time gave a number with "two different digits at the end." Mick further testified that maternal aunt Erin Neal called the agency on January 29, 2020, one week prior to the hearing, and asked for a home study and background check. Neal, however, did not follow through. Mick stated that the children are getting along with their foster parents and are well adjusted.

{¶ 27} Pike County Recovery Council Case Manager Jamie Stinebrook testified that she works with the transitional housing unit, where R.T. resides by court order. She stated that R.T. has been cooperative and engaged in group treatment, and expresses that she misses her children. She also explained that R.T. would probably be in transitional housing for another three to four months.

{¶ 28} R.T. testified that she lives at a transitional housing facility, acknowledged that she used drugs and alcohol during her January 10, 2020 48-hour pass, and stated that she lacks the coping skills to resist. She explained that since then, she learned better ways to behave when overwhelmed. R.T. testified that she takes medication for anxiety, participates in counseling, and discussed volunteering at the dog pound and her plans to become a peer support counselor.

R.T. acknowledged both her fourth-degree felony possession of heroin and treatment in lieu of conviction and her theft conviction and probation violation in the same case in April 2019. She was unsure, however, whether her recent 48-hour pass substance abuse would be considered another probation violation. R.T. also agreed that she had not obtained housing or employment. She stated that during previous drug treatment programs, she earned five 24-hour passes, an eight-hour pass, and one four-hour pass and had never "used," stating, "I'm sorry for my actions. And the reason I stayed in transactional [sic. transitional] is because I don't have the skills to deal with real life, but I'm working on it."

{¶ 29} Hannah Bivens, counsel for the children, testified that K.M. and A.M. stated their desire to "be with" their parents and have not expressed any concern or safety issues. Therefore, Bivens recommended the trial court deny appellee's permanent custody motion.

{¶ 30} Guardian Ad Litem Jacob Wagoner testified that K.M. and A.M. love their parents and the parents attended visits and bonded with the children. However, Wagoner pointed out that in light of R.T.'s recent substance abuse, continued criminal offenses and positive drug screens, he believed it in the children's best interest to grant appellee's permanent custody motion.

{¶ 31} On February 10, 2020, the trial court permanently terminated the appellants' parental rights. Based on the testimony, admitted exhibits, and guardian ad litem report and argument, the court found that appellee had temporary custody of K.M. and A.M. since April 3, 2018, and adjudicated dependent on May 2, 2018 (K.M.) and May 29, 2018 (A.M.). The court stated that because it considered both children to have entered appellee's temporary custody on May 29, 2018, having been in appellee's temporary custody for twelve months of a twenty-two

consecutive month period per R.C. 2151.414(B)(1)(d) the court next considered the R.C. 2151.414(D)(1)(a)-(e) best interest factors.

{¶ 32} The trial court acknowledged that appellants have been appropriate with the children during parenting time, and the children are affectionate toward both parents and appeared to have bonded to them. However, the court noted that S.M. visited less than 60 percent of the time permitted (50 out of 85 times), and R.T. visited less than 48 percent of the time permitted (42 out of 89 times). Although the court recognized that at times both parents would have been unable to visit due to their incarceration and participation in various substance abuse treatment programs, the court inferred a lack of commitment to reunification. The court did note that both children (five and six years old) wished to be with their parents.

{¶ 33} The trial court also found that both children had bonded with their current foster family, a probable adoptive placement. The court reviewed the parents' significant substance abuse and noted that, after twenty-two months starting with S.M.'s overdose in his home in the presence of both children, S.M. continued to abuse illegal substances and elected to put no evidence on the record at the hearing. The court observed that R.T. admitted in April 2018 to daily heroin use and continued to abuse illegal substances and "on January 10, 2020, while on a forty-eight hour pass from her current placement elected to 'get drunk' and use methamphetamine."

{¶ 34} Consequently, the trial court permanently terminated S.M. and R.T.'s parental rights and placed the children in appellee's permanent custody. This appeal follows.

I.

{¶ 35} In their first assignment of error, appellants assert that the trial court erred in

finding that permanent custody is in the children's best interests and the best interest determination is against the manifest weight of the evidence.

### Permanent Custody Principles

{¶ 36} In general, a parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A parent's rights, however, are not absolute. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App.1974); accord *In re B.S.,* 4th Dist. Jackson No. 19CA6, 2019-Ohio-4143, ¶ 41.

### Standard of Review

{¶ 37} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 53 (4th Dist.); *In re T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 25; *In re I.W.,* 4th Dist. Pike No. 19CA902, 2020-Ohio-3112, ¶ 18. When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley v. Volkman*, 132

Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 38} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 32. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶ 39} When reviewing evidence under this standard, appellate courts generally defer to a trial court's determination of matters of credibility, which are crucial in these cases when a written record may not adequately reflect a witnesses' demeanor and attitude. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the decision.'" *Id.*, quoting *Martin* at 175, 485 N.E.2d 717.

Statutory Framework

{¶ 40} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after it obtained temporary custody.  In this case, appellee sought permanent custody of the children by filing a motion under R.C. 2151.413.  When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies.  R.C. 2151.414(A).

{¶ 41} R.C. 2151.414(B)(1) provides that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the conditions in R.C. 2151.414(B)(1)(a)-(e) apply.

{¶ 42} In the case sub judice, the trial court found that the children have been in appellee's temporary custody for more than 12 months of a consecutive 22 month period.  Thus R.C. 2151.414(B)(1)(d) applies, and, because appellants do not challenge the trial court's R.C. 2151.414(B)(1)(d) finding, we do not address it.

{¶ 43} Next, the trial court addressed R.C. 2151.414(D)'s best-interest framework.  In determining the best interest of a child at a hearing held pursuant to division (A) of this section of the Revised Code, R.C. 4151.414(D)(1) instructs courts to consider all relevant factors, including, but not limited to:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the

child's guardian ad litem, with due regard for the maturity of the child;

(c) custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(d) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} R.C. 2151.414(D)(1) requires the trial court "to consider 'all relevant factors,' including five enumerated statutory factors * * *  No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 6.  In applying the R.C. 2151.414(D)(1) factors, the trial court found that it was in the children's best interest to terminate the biological parents' parental rights for the following reasons:

{¶ 45} As for the R.C. 2151.414(D)(1)(a) "the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child," the trial court determined that multiple witnesses testified that the parents had appropriate interactions during parenting time at the Family Advocacy Center.  The children exhibited affection toward both parents and appeared to be bonded to them.  However, while the parents did make some effort to continue weekly visits, the court noted the less than stellar attendance rate of 60% (S.M.) and 48% (R.T.). The record also reveals testimony regarding a strong bond with the foster parents.  The children are placed together in foster care, and their foster parents plan to request adoptive placement

upon termination of parental rights.

{¶ 46} As for the R.C. 2151.414(D)(1)(b) "[t]he wishes of the child," the trial court determined that "the wishes of both children are to be with their parents. The Court notes the children are of tender age (six and five years of age)." The court acknowledged the young children's desire to reunite with their parents. The statute itself instructs the court to consider the wishes of the children "with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). Further, while counsel for the children recommended the court deny the motion for permanent custody, their GAL recommended termination of parental rights and opined that it is in the children's best interest.

{¶ 47} For the R.C. 2151.414(D)(1)(c) factor concerning the children's "custodial history," the court determined that the children have been in the appellee's continuous temporary custody since April 3, 2018.

{¶ 48} As for the R.C. 2151.414(D)(1)(d) "need for a legally secure permanent placement" and the ability to achieve placement without a grant of permanent custody to the agency, the court found:

> [N]o other relative or other interested individual has a pending motion for legal custody of either child. A relative recently requested a home study be performed but had not contacted the AGENCY as of the date of this hearing as requested.
>
> The actions as well as inactions of both parents have established that a legally secure placement for both children cannot be achieved at this time without granting the motion.
>
> This action began twenty-two months ago with the father overdosing in the home with both children present who were ages three and four at the time. The father has continued to abuse illegal substances and elected to put no evidence on the record at the hearing. In April of 2018 the mother admitted to using heroin daily. She has continued to abuse illegal substances and on January 10, 2020, while on

a forty-eight hour pass from her current placement elected to 'get drunk' and use methamphetamine.

After affording both parents an opportunity for the past twenty-two months to reunify with both of their children and to abstain from their self-destructive substance abuse addictions they have failed on both counts. Although the court believes both parents love their children it is obvious their love for impairment is greater, which is tragic for them and more importantly their children.

This Court cannot be expected to experiment with the future of either child in considering their best interest. To allow more time for reunification to either parent expecting their priorities and destructive habits to change would be doing exactly that. All children need permanency/stability in their lives and the two children the subject of this action are no exception. Neither parent has shown an ability or willingness to provide the same.

{¶ 49} The trial court had already denied E.S.'s (maternal grandmother) motion for legal custody and removed her as a party on April 3, 2019. Although a maternal aunt, E.N., contacted appellee one week before the permanent custody hearing, testimony indicated that when asked to come to the agency for a background check, E.N. did not cooperate. Also, the foster mother stated that she and her husband planned to pursue adoption if the court granted the permanent custody motion.

{¶ 50} As for the R.C. 2151.414(D)(1)(e) factor of whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and the children, the trial court did not directly address this factor and appellee concedes that none of the factors listed in (E)(7)-(11) are present. Thus, after a thorough review of the testimony, the trial court determined that the termination of appellants' parental rights is in the children's best interest.

{¶ 51} Appellants do not dispute K.M. and A.M.'s temporary custody for 12 of 22 months, so we do not address it. However, appellants contend that the trial court erred in finding that permanent custody is in the children's best interests and argue that the best interest

analysis is against the manifest weight of the evidence. Appellants assert that the record lacks "competent, credible evidence" to rely upon to grant permanent custody of the children to appellee. In particular, appellants argue that 1) they visited the children; 2) S.M. maintained telephone contact and attended one school program; 3) they provided gifts to the children during visitation; 4) they have a strong bond with the children, and 5) the children wish to be reunited with their parents.

{¶ 52} Although the trial court acknowledged appellants' parenting time efforts, their parental bond with the children, and the children's wishes, these factors are not enough to overcome the overwhelming evidence of unabated addiction. Our review of the record reveals ample competent, credible evidence to support the trial court's determination that appellants did not comply with their case plan for reunification, did not appear to take the plan seriously, and appeared unable or unwilling to successfully address their addictions. As the court concluded, neither parent adequately addressed their addiction, obtained stable housing, or obtained employment. Twenty-two months before the trial court's decision, this action began when S.M. overdosed in the home with both children present (then ages three and four). As the court found, S.M. continued to abuse illegal substances and elected to put on no evidence on the record at the hearing. R.T.'s testimony indicates that she continued to abuse illegal substances. As further evidence of R.T.'s continued struggle with addiction, on January 10, 2020, just 17 days before the permanent custody hearing and while on a 48-hour pass from her current placement, she chose to drink alcohol and use methamphetamine. Sadly, by her own testimony, R.T. acknowledged, "I don't have the skills to deal with real life, but I'm working on it."

{¶ 53} Appellants further argue that the foster mother "testified she might want to adopt

the children, but this did not appear to be a given, so the children might end up in long term foster care." Our review of the transcript reveals that although the foster mother acknowledged that the case plan goal was reunification, she clarified that if the court granted the permanent custody motion, she and her husband are interested in pursuing adoption.

{¶ 54} In addition, appellants contend that the record reflects the maternal grandmother's attempts to obtain legal custody were "rebuffed from the start." Multiple HCCS staff members testified to multiple investigations of multiple incidents of alleged abuse of multiple children between 1976-2005. It is not unreasonable for this extensive history to concern not only the caseworkers, but also the GAL and the trial court.

{¶ 55} A child's best interest is served by placing a child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Thus, courts are not required to favor relative or non-relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64; accord *In re T.G.*, 4th Dist. Athens No. 15CA24, 2015-Ohio-5330, ¶ 24; *In re C.B.C.,* 4th Dist. Lawrence No. 15CA18, 15CA19, 2016-Ohio-916, ¶ 66.

{¶ 56} Furthermore, the Supreme Court of Ohio has held that a trial court need not find "by clear and convincing evidence that no suitable relative was available for placement." *Schaefer, supra,* at ¶ 64. This court has also held that "a trial court need not first determine that no suitable relative placement exists before it may grant permanent custody to a children services agency." *In re J.M.*, 4th Dist. Ross Nos. 18CA3633, 18CA3634, 18CA3635, 18CA3664, 18CA3665, 2018-Ohio-5374, ¶ 60.

{¶ 57} Consequently, after our review in the case sub judice, we agree with the trial court's conclusion that ample evidence was adduced during the proceedings to support the determination that a permanent custody award is warranted and in the best interest of the children.

{¶ 58} Accordingly, based upon the foregoing reasons we overrule appellants' first assignment of error.

II.

{¶ 59} In their second assignment of error, appellants assert that the trial court should have dismissed the case because it exceeded the statutory 90-day period for disposition.

{¶ 60} R.C. 2151.35(B)(1) provides:

If the court at an adjudicatory hearing determines that a child is an abused, neglected, or dependent child, the court shall not issue a dispositional order until after the court holds a separate dispositional hearing. The court may hold the dispositional hearing for an adjudicated abused, neglected, or dependent child immediately after the adjudicatory hearing if all parties were served prior to the adjudicatory hearing with all documents required for the dispositional hearing. The dispositional hearing may not be held more than thirty days after the adjudicatory hearing is held. The court, upon the request of any party or the guardian ad litem of the child, may continue a dispositional hearing for a reasonable time not to exceed the time limits set forth in this division to enable a party to obtain or consult counsel. *The dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed.*

If the dispositional hearing is not held within the period of time required by this division, the court, on its own motion or the motion of any party or the guardian ad litem of the child, shall dismiss the complaint without prejudice. (Emphasis added.)

{¶ 61} Appellant filed an amended brief after the Supreme Court of Ohio addressed this statute on March 19, 2020. In *In re K.M.*, __ Ohio St.3d __, 2020-Ohio-995, __ N.E.3d __, the

Supreme Court considered whether R.C. 2151.35(B)(1) mandates the dismissal of a case if a juvenile court fails to conduct a dispositional hearing within 90 days of the filing of a complaint that alleges that a child is abused, neglected, or dependent.  *Id.* at ¶ 1.  Citing the language of R.C. 2151.35(B)(1) referenced above, the court held:

> If the juvenile court fails to conduct a dispositional hearing within 90 days of the filing of the complaint, it 'shall dismiss the complaint, without prejudice.' either upon a motion filed by one of the parties or the guardian ad litem or upon the court's 'own motion.'  By requiring dismissal after the expiration of 90 days, the General Assembly leaves no doubt that it intended to impose a mandatory deadline.

*Id.* at ¶ 23.

{¶ 62} Appellee concedes that this case exceeded the R.C. 2151.35(B)(1) 90-day time limit.  Appellee, however, argues that the case at bar involves an express waiver of the 90-day limit.  We agree.  In the case sub judice, appellee filed the complaint on April 3, 2018.  After the adjudicatory hearing, the trial court adjudicated the children dependent.  At a hearing on May 29, 2018, the court noted the dispositional hearing scheduled in two days, but indicated that S.M.'s counsel had a prior trial.  The court stated that it was prepared to hold the dispositional hearing by July 3, 2018, but the case involved three attorneys' schedules.  The parties all orally waived the 90-day period and, on May 29, 2018, the trial court issued an entry that reset disposition and stated, "[b]oth parents waived the 90-day dispositional requirement if the same could not be timely set."  The court held the disposition hearing on August 2, 2018, approximately 120 days after appellee filed the complaint.

{¶ 63} In *In re K.M.*, the appellate court held that the parents implicitly waived their right to a 90-day disposition.  Although the Supreme Court noted the adverse consequences that can

result from construing the 90-day deadline in R.C. 2151.35(B)(1) as mandatory, the court focused on the General Assembly's concern for "the fundamental right of a parent to raise one's own children." *In re K.M.* at ¶ 29. While the Supreme Court held that the 90-day time limit is mandatory, the court also held, "In the face of such language, there can be no *implicit* waiver of the 90-day limit." (Emphasis added.) *K.M., supra,* ¶ 26. Thus, we conclude that express waivers are permitted. In the case at bar, the parents themselves explicitly waived the 90-day statutory safeguard to which *In re K.M.* refers. In so doing, they chose to extend the date of the dispositional hearing. To hold otherwise in the case sub judice would be an affront to judicial economy and not comply with the legislature's desire for a timely disposition. This case is not an example of cases in which a trial court continues a case far beyond the stated deadline.

{¶ 64} The Seventh District also compared the time limit for a dispositional hearing to that of speedy trial limits. *In re Kimble*, 7th Dist. Harrison No. 99517CA, 2002-Ohio-2409. "If the defendant files a motion, the court shall dismiss the case (with prejudice in the case of speedy trial). However, if the defendant fails to timely raise the issue in the trial court, he has waived his right to a speedy trial. *Kimble* at ¶ 24, citing *Village of Montpelier v. Greeno*, 25 Ohio St.3d 170, 171, 495 N.E.2d 581 (1986) (holding that speedy trial violations are not jurisdictional). Thus, *Kimble* held that "although a court may sua sponte dismiss a case and when so dismissing it must do so without prejudice, R.C. 2151.35(B)(1) is not self-executing. Hence, the parties can waive the time limits." *Supra,* at ¶ 26. The court concluded that the appellant in that case expressly waived all time requirements on the record.

{¶ 65} Moreover, the Supreme Court previously held, "[t]he passing of the statutory time period ('sunset date') pursuant to R.C. 2151.353(F) does not divest juvenile courts of jurisdiction

to enter dispositional orders." *In re Young*, 76 Ohio St.3d 632, 637, 669 N.E.2d 1140 (1996), syllabus. *In re K.M.* did not hold that the time limit for holding the dispositional hearing pursuant to R.C. 2151.35(B)(1) is jurisdictional. Thus, the statute does not clearly deprive a court of jurisdiction to hold a dispositional hearing outside the time limits, or state that cases shall be automatically dismissed without prejudice, and explicitly requiring a court to raise the issue sua sponte if a party or guardian ad litem does not. *See In re Kimble* at ¶ 21, citing *State v. Bellman*, 86 Ohio St.3d 208, 210, 714 N.E.2d 381 (1999) (noting how the language of R.C. 2921.401 explicitly states that a court does not have jurisdiction once the time runs on an untried indictment after a prisoner requests trial).

{¶ 66} Thus, for the reasons stated above, we conclude appellants expressly waived R.C. 2151.35(B)(1)'s requirement that a juvenile court dismiss a case without prejudice if the court fails to conduct a dispositional hearing within 90 days of the filing of a complaint alleging that a child is abused, neglected or dependent.

{¶ 67} Accordingly, based upon the foregoing reasons we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellants the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court, Juvenile Division, to carry these judgments into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.