[Cite as *In re D.G*, 2021-Ohio-429.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE:  D.G. | : | APPEAL NOS. | C-200359 |
| | | | C-200371 |
| | : | TRIAL NO. | F18-117X |
| | : | | |
| | | *O P I N I O N.* | |
| | : | | |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  February 17, 2021

*Joseph T.  Deters,* Hamilton County Prosecuting Attorney, *Jennifer Weigel,* and *Gretta Herberth*, Assistant Prosecuting Attorneys, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Roxanna Mehdi,* Assistant Public Defender, for Guardian ad Litem for D.G.,

*Treleven and Klingensmith Law LLC, Celia Klug Weingartner,* for Guardian ad Litem for Appellant Mother,

*Christopher Kapsal,* for Appellant Mother.

**BERGERON, Judge.**

{¶1}  In this parental termination case, we must evaluate the weight and sufficiency of the evidence underlying the trial court's grant of permanent custody to the Hamilton County Department of Job and Family Services ("HCJFS"), as well as the applicability of R.C. 2151.35(B)(1) when all parties expressly waive the 90 day dispositional deadline.  Because we find the trial court's decision supported by both the weight and sufficiency of the evidence, and we conclude that parents may explicitly waive the dispositional deadline, we affirm the judgment of the trial court.

I.

{¶2}  This case arose out of an incident in January 2018, when Mother placed a 911 call that escalated into her involuntary hospitalization for psychiatric care.  On the same day as Mother's hospitalization, HCJFS secured an ex parte emergency placement order for D.G. (Mother's only child), acting with haste because D.G.'s school had already alerted it to potential concerns with Mother.  Mother remained in psychiatric care for approximately two weeks, receiving a diagnosis of "unspecified psychosis."

{¶3}  A few months later, D.G. was adjudicated dependent.  Between adjudication and disposition, the magistrate convened a series of six hearings, entertaining testimony from ten witnesses.  Mother's reunification plan, forged at the beginning of these hearings, called for individual therapy for Mother, medication management, family therapy, visitation, and maintenance of stable housing and income.

{¶4}  Mother's mental health, however, overshadowed everything else at the hearings.  In addition to her diagnosis at the hospital of "unspecified psychosis," Mother was evaluated through the Family Access to Integrated Recovery ("FAIR")

program, which diagnosed her as suffering from "delusional disorder." Multiple witnesses corroborated this diagnosis, chronicling delusional episodes by Mother over the course of several years. The principal of D.G.'s school, for example, testified that Mother regularly sent mass emails to school staff, other parents, and grandparents admonishing that she "was being harassed or followed by or videotaped" by unknown stalkers. The sheer number of emails, along with their content, caused the principal to meet with Mother one-on-one to evaluate whether she posed a risk of self-harm. A friend of Mother's, with whom Mother and D.G. were living prior to Mother's hospitalization, echoed that Mother believed "people were following her, people were trying to hurt her." Similarly, the HCJFS caseworker testified that more than a year after D.G.'s removal, Mother still believed "they are following her, they are tape recording her," but would not elucidate "who 'they' are."

{¶5} Although Mother completed a substantial amount of therapy during disposition, she resisted the contention that she had any mental health problems, concluding that therapy was superfluous but for the court's insistence that she complete it. Mother portrayed D.G.'s removal as a result of "false allegations" against her and suspected that her diagnosis had been fabricated for insurance purposes. She declined to take medication for mental health management at any point during the relevant time period.

{¶6} In 2019, the magistrate approved D.G.'s move from foster care in Cincinnati to live with his maternal grandparents in South Carolina—with whom Mother has a very strained relationship. Nevertheless, Mother continued to visit D.G. in South Carolina for six hours every other weekend. By January 2020, HCJFS filed a motion to modify temporary custody to permanent custody, which the magistrate granted. Mother and Mother's Guardian ad Litem ("GAL") timely

3

objected to the trial court, which nonetheless adopted the magistrate's decision. Mother and her GAL now appeal, asserting two total assignments of error.

II.

{¶7} In her first assignment of error, Mother challenges the juvenile court's award of permanent custody on sufficiency and manifest-weight grounds. Mother's GAL joins in the manifest-weight challenge, but not the sufficiency challenge. For ease of reading, we will address Mother's sufficiency challenge first.

{¶8} When reviewing a grant of permanent custody, we conduct an independent review to consider whether sufficient evidence supported the clear-and-convincing standard. *In re J.W.,* 1st Dist. Hamilton No. C-190189, 2019-Ohio-2730 ¶ 13 ("Reviewing a juvenile court's grant of a motion for permanent custody requires us to independently find that the decision is supported by clear and convincing evidence."), citing *In re W.W.,* 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. We will accept the trial court's factual determinations if they are underpinned by "some competent and credible evidence." *In re W.W.* at ¶ 46. Nonetheless, "whether the evidence is sufficient to sustain the judgment is a question of law," which we review de novo. *In re A.B.,* 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15, citing *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11.

{¶9} Following an adjudication of dependency, R.C. 2151.413(A) permits a court to award permanent custody to an agency upon satisfaction of a two-prong test. *In re S.G.,* 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, ¶ 31; *In re F.B.,* 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 16. The court may grant permanent custody if it finds, by clear and convincing evidence: (1) that one of the conditions in R.C. 2151.414 (B)(1)(a) through (e) is satisfied; and (2) that a grant of

permanent custody is in the child's best interest, pursuant to the factors listed in subsection (D)(1). *See* R.C. 2151.414(B)(1) and (D)(1); *In re F.B.* at ¶ 18. "In conducting the best-interest analysis 'no single factor is given greater weight or heightened significance.' " *Id.* at ¶ 19, quoting *In re P.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35.

{¶10} The parties agree that R.C. 2151.414(B)(1)(d)—the child has been in the temporary custody of an agency for 12 or more months of a consecutive 22 month period—applies to D.G.. The first prong of our two-prong test is therefore satisfied, and Mother's sufficiency challenge turns entirely on the adequacy of the trial court's best interest analysis.

{¶11} Appellate review of the best interest determination in this case is greatly enhanced by the trial court's careful delineation of its reasoning for each of the R.C. 2151.414(D)(1)(a) through (e) factors. *See In re A.M.,* Slip Opinion No. 2020-Ohio-5102, ¶ 32 (clear discussion of the statutory factors "facilitate[s] appellate review" and "increase[s] public confidence in the judicial process"). For example, Mother contends on appeal that the trial court failed to accord proper weight to her close bond with D.G., including the fact that she maintained consistent visitation throughout disposition. But in its discussion of the R.C. 2151.414(D)(1)(a) best interest factor, the trial court acknowledged that Mother and D.G. are "clearly bonded" and praised Mother's visitation record. By the same token, it found that D.G. was also "bonded with his grandparents," who "have the ability to continue meeting [D.G.'s] physical, emotional, educational, and therapeutic needs" in a manner that Mother cannot. We are confident based on this analysis that the trial court properly considered R.C. 2151.414(D)(1)(a).

{¶12} Mother's insistence that D.G.'s wishes were "unclear" at the close of disposition runs headlong into the trial court's summary of the relevant R.C. 2151.414(D)(1)(b) testimony. Just days before the final disposition hearing, D.G. expressed to his *In re Williams* attorney that he was "not ready" to go back to Mother, because he did not "believe that Mother w[ould] change her behaviors." Mother's refusal to believe this statement cannot overcome the testimony in the record, and we find that the trial court's order properly factored D.G.'s preferences into its R.C. 2151.414(D)(1)(b) analysis.

{¶13} Mother's objections to the trial court's R.C. 2151.414(D)(1)(c) analysis—concerning the custodial history of the child—are also unavailing. We acknowledge Mother's point that she cared for D.G. without incident for more than eight years of his life, but this history cannot erase the fact that D.G. had been in temporary custody of HCJFS for 21 consecutive months by the filing of the permanent custody motion. This fact helped support the trial court's finding that R.C. 2151.414(D)(1)(c) weighed in favor of permanent custody.

{¶14} Finally, the heart of the trial court's best interest determination—and of Mother's sufficiency challenge—was its conclusion that R.C. 2151.414(D)(1)(d) (the child's need for a legally secure placement) weighed in favor of a grant of permanent custody. The trial court found that, at the time of its order, D.G. "had been in the custody of HCJFS for over two years * * * [and] Mother ha[d] not successfully remedied the conditions that caused [D.G.] to be removed from her home." Mother, for her part, contends that multiple professionals disputed her diagnosis—essentially suggesting that she had nothing left to remedy.

{¶15} Unfortunately for Mother, the record simply does not substantiate her claims. Only one brief letter from the Central Clinic attests to a doctor's belief that

Mother "does not meet the criteria" for delusional disorder—but the letter did not address whether other conditions, such as "unspecified psychosis," might be at play. Besides this, Mother relies on a handful of statements from doctors who had not completed a full diagnostic assessment, and thus could not offer (or refute) any diagnosis whatsoever.

{¶16} In contrast, competent and credible evidence supported the trial court's factual finding that Mother continued to suffer from paranoid delusions throughout disposition. We need not look much further than Mother's own testimony to see examples of this. Mother repeatedly testified that unknown individuals were making film "parodies" of her and D.G. and posting them to social media. She blamed her hospitalization on an incident where her sister "vandalized" her car in South Carolina, despite the fact that this incident occurred more than a year before her 911 calls. Alternatively, she attributed her January 911 call to the fact that D.G. and a friend were "teasing" her, and she needed police intervention to make them stop. Mother's mass emails to D.G.'s school—a sampling of which can be found in state's exhibits 1-4—attest to her enduring belief that she is being followed, framed, hacked, and "played with" for the entertainment of others. Even if one might quibble with Mother's technical diagnosis, her symptoms of paranoia and delusional thinking are wholly consistent across testimony, medical records, and other exhibits. These symptoms clearly impair her ability to care for D.G., and substantiate D.G.'s legitimate concerns about her behavior.

{¶17} All parties agree that R.C. 2151.414(D)(1)(e) does not apply to Mother, leaving nothing more in the trial court's best interest determination for Mother to contest. In light of our agreement with the trial court's analysis of factors (D)(1)(a) through (D)(1)(d), we find that the trial court's best interest determination was

supported by sufficient evidence, and we overrule the sufficiency prong of Mother's assignment of error.

{¶18} Next, Mother and Mother's GAL challenge the juvenile court's decision as against the manifest weight of the evidence. "In reviewing a challenge to the weight of the evidence, we review the record to determine whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed." *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 27; *In re Z.W.*, 1st Dist. Hamilton No. C-200061, 2020-Ohio-3100, ¶ 7.

{¶19} As the trial court recognized, Mother "substantially engaged in many of the case plan services" and is "clearly bonded" with D.G. Mother's deep love for D.G. and sincere desire to reunite her family is evident in every facet of this record. However, Mother continually refused to acknowledge that she suffers from any kind of mental instability, and treated her mental health problems only to the extent that these proceedings forced her to attend therapy. Given the extensive evidence of Mother's delusional behavior and the demonstrated impact of that behavior on Mother's ability to provide a stable and secure environment for D.G., we cannot say that the trial court's decision to award permanent custody constituted a "manifest miscarriage of justice." We therefore overrule Mother's sole assignment of error—and Mother's GAL's second assignment of error—in full.

III.

{¶20} In an additional assignment of error, Mother's GAL contends that the trial court's failure to complete disposition of this case within 90 days mandated a dismissal without prejudice under the Ohio Supreme Court's decision in *In re K.M.*, 159 Ohio St.3d 544, 2020-Ohio-995, 152 N.E.3d 245, ¶ 23. Neither Mother nor her

GAL raised this issue in their objections to the magistrate's decision. "Therefore, we can reverse only upon a finding of plain error." *In re H. Children,* 1st Dist. Hamilton No. C-190630, 2020-Ohio-774, ¶ 22.

{¶21} R.C. 2151.35(B)(1) provides that a dispositional hearing "shall not be held more than ninety days after the date on which the complaint in the case was filed." Absent such a timely hearing, "the court, on its own motion or the motion of any party or the guardian ad litem of the child, shall dismiss the complaint without prejudice." R.C. 2151.35(B)(1). In *In re K.M.,* the Ohio Supreme Court explained that the statutory scheme does not allow for implicit waivers of the 90 day deadline:

> If the juvenile court fails to conduct a dispositional hearing within 90 days of the filing of the complaint, it "shall dismiss the complaint without prejudice," either upon a motion filed by one of the parties or the guardian ad litem or upon the court's "own motion." By requiring dismissal after the expiration of 90 days, the General Assembly leaves no doubt that it intended to impose a mandatory deadline.

*In re K.M.* at ¶ 23. Mother's GAL seizes upon this language to challenge the trial court's proceeding with disposition beyond the 90 day timeline. HCJFS and D.G.'s GAL, however, present two counterarguments: first, they dispute that *In re K.M.* should be applied retroactively; and, second, they maintain that when all parties make an *explicit* waiver of the 90 day deadline, *In re K.M.* does not apply. We will address each argument in turn.

{¶22} "[T]he general rule is that an Ohio court decision applies retrospectively unless a party has contract rights or vested rights under the prior decision." *DiCenzo v. A-Best Prods. Co., Inc.*, 120 Ohio St.3d 149, 2008-Ohio-5327, 897 N.E.2d 132, ¶ 25. An Ohio court has discretion to apply its decision

9

prospectively-only after it explicitly weighs three considerations: "(1) whether the decision establishes a new principle of law that was not foreshadowed in prior decisions; (2) whether retroactive application of the decision promotes or retards the purpose behind the rule defined in the decision; and (3) whether retroactive application of the decision causes an inequitable result." *Id.* Prospective-only application "is justified only under exceptional circumstances." *Id.* at ¶ 28.

{¶23} The Ohio Supreme Court failed to include any discussion of prospective-only application in *In re K.M.*, so we should presume that the decision applies retroactively. Moreover, the idea that a statute can use the word "shall" to impose a mandatory deadline on proceedings does not strike us as a "new principle of law." The only "inequitable result" that *In re K.M.* can yield is the result explicitly endorsed by the decision: requiring dismissal without prejudice when a court (even benignly) exceeds the 90 day deadline. Therefore, we have no trouble concluding that *In re K.M.* applies retroactively—and could be applied in this case.

{¶24} Next, we turn to a novel issue in the First District: whether *In re K.M.* allows the parties to explicitly waive the 90 day deadline in R.C. 2151.35(B)(1). But we first set the stage a bit with some additional context. This case was originally set for adjudication and disposition on February 26, 2018—just 32 days after HCJFS filed its complaint. Mother's counsel requested a continuance extending the adjudicatory phase, and the court granted a continuance until April 6, 2018. The docket entry for the April 6, 2018 hearing reads: "All parties waive any objection to the completion of the adjudication and/or disposition within 90 days of the filing of the complaint." No party contests the accuracy of this entry, which provides us an instance of express waiver. The court adjudicated D.G. dependent on April 30, 2018, and dispositional hearings began on June 13, 2018—well outside the 90 day window.

{¶25} One Ohio appellate district has already addressed the issue of express waiver of the 90 day R.C. 2151.35(B)(1) deadline. In the Fourth District's *Matter of K.M.,* all parties expressly waived the 90 day requirement because of conflicting attorneys' schedules. *Matter of K.M.*, 4th Dist. Highland Nos. 20CA4 and 20CA6, 2020-Ohio-4476, ¶ 62. After acknowledging the Ohio Supreme Court's prohibition on implicit waiver, the Fourth District nonetheless found that R.C. 2151.35(B)(1) allows for express waivers. *Id.* at ¶ 63. It explained that, although the 90 day deadline in R.C. 2151.35(B)(1) is mandatory, the statute does not automatically "deprive a court of jurisdiction to hold a dispositional hearing outside the time limits, or state that cases shall be automatically dismissed without prejudice * * * ." *Id.* at ¶ 65. Moreover, a holding that disallowed express waiver "would be an affront to judicial economy and not comply with the legislature's desire for a timely disposition." *Id.* at ¶ 63.

{¶26} We find *Matter of K.M.* to be persuasive—especially when coupled with further examination of the Supreme Court's reasoning in *In re K.M.* The *In re K.M.* Court reached its conclusion that R.C. 2151.35(B)(1) disallows implicit waiver by reasoning that the statute "contain[s] an express limitation on a juvenile court's *authority* for *failure to comply* with a statutory deadline." (Emphasis added.) *In re K.M.,* 159 Ohio St.3d 544, 2020-Ohio-995, 152 N.E.3d 245, at ¶ 23. This express limitation on the authority of the juvenile court, in turn, weighed in favor of a mandatory (rather than directory) deadline. *Id.* Because R.C. 2151.35(B)(1) placed the onus on the trial court to "conduct a dispositional hearing within 90 days of the filing of the complaint * * * [or] 'dismiss the complaint,' " the *In re K.M.* court concluded that the *inaction* of the parties (i.e. implicit waiver) could not excuse the trial court's noncompliance with the statute. *Id.* at ¶ 23, 26, quoting R.C.

2151.35(B)(1). As a consequence, a juvenile court that forced the parties to continue litigating past the 90 day dispositional deadline exceeded its statutory authority, obligating it to dismiss the case "on its own motion or the motion of any party or the guardian ad litem of the child." *Id.* at ¶ 3, quoting R.C. 2151.35(B)(1).

{¶27} But while this reasoning supports a conclusion against implicit waiver, it fails to illuminate the context of *explicit* waiver. Unlike implicit waiver, an explicit waiver involves affirmative action by all parties—independent of the trial court, on the record, and before the 90 days expire—to waive the R.C. 2151.35(B)(1) timeline for disposition. As such, there is no "failure" by the trial court to comply with the statute, nor any unwarranted exercise of "authority" by the trial court upon the parties. *See In re K.M.* at ¶ 23. Instead, the parties choose to forgo their statutory rights to an R.C. 2151.35(B)(1) dismissal, and the trial court simply honors that choice.[1] There is little danger—as with implicit waiver—of misinterpreting parents' intentions or infringing upon their rights.

{¶28} In fact, we are convinced that the danger in this case runs the opposite direction, and that serious due process problems could arise from denying parents the ability to expressly waive the 90 day deadline. Time and again, we have equated parental termination cases to "the family-law equivalent of the death penalty in a criminal case," and emphasized that it is " 'critical that the rights of a parent who faces the permanent termination of parental rights are appropriately protected." *In re S.G.,* 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, at ¶ 20, quoting *In re R.K.,* 152 Ohio St.3d 316, 2018-Ohio-23, 95 N.E.3d 394, ¶ 1. We have also acknowledged that "[d]ismissal of a parental-termination case without prejudice is

---

[1] We note that the trial court can also choose *not* to honor the parties' explicit waiver of the R.C. 2151.35(B)(1) time limit, and instead dismiss the action upon its own motion.

not always the best outcome for the parties involved—even for the parents." *In re M.U.,* 1st Dist. Hamilton Nos. C-130809 and C-130827, 2014-Ohio-1640, ¶ 10. A dismissal without prejudice does not necessarily mean that a parent regains custody: instead, HCJFS retains its ability to simply refile the complaint. Refiling sends all parties back to the starting line, further delaying any potential reunification.

{¶29} A parent who explicitly waives the 90 day R.C. 2151.35(B)(1) deadline opts to avoid this restart and extend the timeline for disposition—and there are many valid reasons to do so. A key witness may be difficult to locate; critical records could take time to review; a parent might be temporarily hospitalized or otherwise unable to testify.[2] Denying a continuance in any of these circumstances could deprive a parent of the opportunity to present their best case, and could itself rise to the level of a due process violation. *See In re M/W,* 1st Dist. Hamilton No. C-180623, 2019-Ohio-948, ¶ 41-43 (trial court's denial of a continuance, which prevented a mother from testifying, violated the mother's due process rights—even where the continuance exceeded a statutory deadline). Forcing a parent to choose between presenting a subpar case on the 90 day R.C. 2151.35(B)(1) timeline or accepting a months-long delay for refiling (with all other statutory deadlines still ticking) creates a Hobson's choice incompatible with our longstanding recognition of parents' fundamental liberty interest in the care, custody, and control of their children. *See In re K.M.,* 159 Ohio St.3d 544, 2020-Ohio-995, 152 N.E.3d 245, at ¶ 29.

{¶30} Parallels to a criminal defendant's speedy trial right underscore the importance of—and statutory support for—allowing explicit waiver in this context.

---

[2] In fact, the timeline of Mother's hospitalization raises this precise issue. Mother was hospitalized beginning on January 24, 2018; the combined adjudication and disposition hearing was originally set for February 26, little more than a month later. Mother was released from psychiatric care just a couple of weeks before this hearing date, and we have no way of knowing whether she had sufficient time to recover and coordinate with counsel to prepare her defense—but certainly the request for a continuance suggests that more time was necessary.

*See, e.g., In re Kimble,* 7th Dist. Harrison No. 99517CA, 2002-Ohio-2409, ¶ 24-26 (analogizing to speedy trial rights in support of its holding that "R.C. 2151.35(B)(1) is not self-executing."). An Ohio defendant's "fundamental right" to a speedy trial is outlined in R.C. 2945.71, which imposes "a *mandatory* duty to try an accused within the time frame provided by the statute." (Emphasis added.) *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, 971 N.E.2d 937, ¶ 14. "Strict compliance with the statute is required," *id.*, and a violation mandates dismissal "[u]pon motion made at or prior to the commencement of trial." R.C. 2945.73(B). Yet there is no question that "a defendant can waive the right to a speedy trial * * * 'as he might waive any other right accorded him by statute * * *.' " *State v. Adams*, 43 Ohio St.3d 67, 69, 538 N.E.2d 1025 (1989), quoting *State v. Kidd*, 60 Ohio App.2d 374, 376, 397 N.E.2d 768 (1st Dist.1978). The decision to waive is often tactical: for example, it might allow the defendant more time to gather exculpatory evidence, or to otherwise prepare for trial. We would never invoke R.C. 2945.71 as grounds to force a criminal defendant to a premature trial in spite of his knowing and valid attempts to waive his right.

{¶31} So too here. The 90 day deadline in R.C. 2151.35(B)(1) functions as an important safeguard to prevent undue delay of disposition—but it is not a double-edged sword, to be turned against parents who need more time to present a successful defense of their parental rights. *In re K.M.* established that the R.C. 2151.35(B)(1) deadline is "mandatory." But as our discussion of R.C. 2934.71 reveals, the mere fact that a statutory deadline is "mandatory" does not transform it to *wholly* unwaivable. There is a world of difference between implicit waiver (which operates systemically against parents) and explicit waiver (which can clearly work in their favor). The very fact that the R.C. 2151.35(B)(1) timeline is enforced by

motion—again like speedy trial—implies that the parties may opt *not* to make a motion. And when all parties communicate their express waiver of the deadline to the court before the 90 days have run, we see no reason to force the parties to a premature disposition or dismissal of the case.[3]

{¶32} In this case, Mother expressly waived the 90 day R.C. 2151.35(B)(1) deadline, and thereby gained the advantage of an extended adjudicatory phase to prepare and present evidence against the eventual adjudication of dependency. The fact that Mother did not obtain her desired outcome does not mean that we should rob future parties of the same advantage. We accordingly hold that when all parties explicitly agree to waive the 90 day deadline in R.C. 2151.35(B)(1), the Ohio Supreme Court's ruling in *In re K.M.* does not mandate a dismissal without prejudice. Accordingly, we overrule Mother's GAL's first assignment of error, and affirm the judgment of the trial court.

Judgment affirmed.

**ZAYAS, P.J.,** and **MYERS, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

---

[3] We acknowledge, of course, the imperfection of the comparison to speedy trial. Waiver of a defendant's speedy trial rights occurs in context of a specific statutory framework for tolling of the R.C. 2945.71 timeline, and no parallel tolling provision exists for R.C. 2151.35(B). *See* R.C. 2945.72. Nonetheless, we are convinced that the decisive point is not the procedure for waiver (which is itself distinct from tolling), but rather the nature of a "mandatory" statutory right and the practical impact of denying waiver to the holder of that right. So far as the speedy trial right is both mandatory and waivable, we find that the R.C. 2151.35(B) right to 90 day disposition can also be both mandatory and waivable.