[Cite as *In re L.G.*, 2021-Ohio-1947.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

IN THE MATTER OF:                    :

   L.G.,                             : CASE NO. 20CA3928

   Adjudicated Dependent
   Child.                            : DECISION AND JUDGMENT ENTRY

                                     :

_____

APPEARANCES:

George L. Davis, IV, Portsmouth, Ohio for appellant.[1]

David M. Huddleston, New Boston, Ohio, for appellee.

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:6-4-21
ABELE, J.

{¶1} This is an appeal of a Scioto County Common Pleas Court, Juvenile Division, judgment that granted Scioto County Children Services (SCCS), appellee herein, permanent custody of L.G., the biological child of mother A.G., appellant herein.

Appellant assigns one error for review:

> "THE TRIAL COURT ERRED BY GRANTING PERMANENT
> CUSTODY BECAUSE SUCH WAS AGAINST THE MANIFEST

---

[1] Different counsel represented appellant during the trial court proceedings.

WEIGHT OF THE EVIDENCE."

**{¶2}** Appellant is the natural mother of L.G., born August 7, 2008. On June 7, 2017, appellee filed a complaint and motion for temporary emergency custody. The complaint alleged L.G., an eight-year-old boy with severe autism spectrum disorder, to be a dependent child. In particular, the complaint averred that, because L.G. lacked adequate parental care due to his mother's mental or physical condition, the child's condition or environment warranted the agency to assume his guardianship.

**{¶3}** Apparently, a June 6, 2017 report and subsequent SCCS home visit revealed that dirty diapers, food products, pizza boxes, and trash littered appellant's home. The complaint alleged appellant to be disheveled, confused, and that she informed law enforcement that "someone had invaded the house and did all the damage, and that the NSA had bugged her house." Officials also found L.G., dressed in a diaper and food-covered t-shirt that he had been wearing for at least two days.

**{¶4}** Law enforcement transported appellant to a mental health facility for evaluation and involuntary hospitalization. An investigation also revealed an extensive history with L.G. due to his mother's mental health issues and the child's autism spectrum

disorder diagnosis.  The child's biological father lived out of state, and L.G.'s maternal grandmother, who had cared for him in the past, could not do so now.

{¶5}  On June 7, 2017, the trial court issued an emergency care order.  SCCS then developed a case plan that appellant would need to undertake to protect L.G: (1) complete a mental health evaluation; (2) take all prescribed medications; (3) refrain from self-adjusting her medications; (4) regularly meet with her medical team; (5) keep her home clean, vacuum when necessary, wash dishes daily and take out the garbage; and (6) send L.G. to school daily.

{¶6}  Subsequently, appellee requested permanent custody of the child.  SCCS asserted that L.G. had been in its temporary custody for more than 12 months out of a consecutive 22-month period. Appellee further claimed that appellant has bi-polar disorder, a history of discontinuing her medication, and that she can become "paranoid and delusional."  SCCS also noted that it took custody of the child by parental agreement three times, and on four other occasions removed the child from his mother's care.  The motion also stated that appellant had been involuntarily hospitalized for several months, released in October 2017 to a group home, but relapsed and was again hospitalized.

{¶7} The permanent custody motion further alleged that, after appellant's April 2018 release from the state hospital, she increased her visits with L.G. After SCCS placed L.G. on an "extended home visit" on December 19, 2018, a caseworker visited appellant's home on January 11, 2019 and observed a visibly agitated L.G., who had been sent home from school due to his disruptive behavior. The caseworker further observed that home conditions "were becoming a concern."

{¶8} On January 23, 2019, appellant called the caseworker to accuse her of stealing appellant's purse. After the caseworker visited appellant's home and searched for her purse, they found the purse under a chair cushion. However, appellant's home was in "disarray, with dirty clothes piled up, dirty dishes all over, and a broken-down bed frame in the dining room." Appellant blamed L.G. for the mess and said that she heard the voice of a "creeper" who tells L.G. to tear up papers and throw them on the floor. Appellant also accused the caseworker of stealing her keys.

{¶9} Due to L.G.'s behavior, SCCS transferred him to a different school. However, the new school reported that L.G.'s outbursts had become very aggressive and caused concern for staff safety. Meanwhile, appellant called SCCS's hotline to report about

SCCS stalking her.

{¶10} The permanent custody motion further alleged that a caseworker and supervisor visited appellant's home on March 1, 2019 and discovered deteriorated mental condition and home conditions, and that L.G. exhibited aggressive behavior. Consequently, SCCS removed L.G. from appellant's home and, because of no other available placement, returned him to a home that specializes in children with autism spectrum disorder. The permanent custody motion also alleged appellant's inability to remain stable, to provide specialized care that L.G. requires, the absence of any area relatives who could provide for L.G., and the disruptions caused by repeated removals.

{¶11} On November 26, 2019, the trial court held a hearing to consider appellee's request for permanent custody. Because L.G.'s biological father (E.I.) appeared for only the second time during the proceedings, the trial court appointed counsel for E.I. and continued the hearing.

{¶12} On January 28, 2020, SCCS, appellant, appellant's counsel, E.I., E.I.'s counsel and the guardian ad litem (GAL) appeared at the permanent custody hearing. E.I. testified that he also has bi-polar disorder, a "lack of experience with autistic

children," and that he had not seen L.G. since he was four-years-old.  E.I. testified that "with her being bipolar that there are mood swings and even if I have custody of him, I don't think I would be any better than her and I think that we're detrimental to his autism getting better.  So I'd rather give him to somebody * * * that can take care of him the way he's supposed to be."  E.I. agreed to terminate his parental rights and further opined that L.G. should not be returned to appellant.  E.I. testified that L.G.'s placement [with the specialized foster home] means that he is "getting help on his autism and our intervening is going to hurt him."

{¶13} SCCS Caseworker Naomi Kinsel testified that SCCS has been involved with L.G. since 2010, when they first removed him from appellant's care through parental agreement.  SCCS removed L.G. again in October 2011, and returned him to appellant in September 2012.  SCCS removed L.G. once again by parental agreement in February 2013 and August 2014.  Kinsel, who became the caseworker in 2014, testified that because appellant was "not taking her medications as prescribed and so, he was removed from the home again so that she could get herself together again.  Get the home cleaned up, get back on her meds, get back on track."

{¶14} Caseworker Kinsel explained that in January 2015,

appellant's mother, V.G., assumed L.G.'s legal custody for approximately six months.  However, there "was an incident at the home. [V.G.] couldn't manage [L.G.'s] behavior.  I believe that was the time that he had gotten out of the house.  He had run away toward a neighbor's house.  There was a pool.  He was going straight for the pool and we removed him then. * * * [V.G.] reported that she could no longer manage [L.G.]."  Thus, SCCS removed L.G. from V.G.'s custody in July 2015.  In October 2015, SCCS returned L.G. to appellant.

{¶15} Caseworker Kinsel further testified that the current case began in June 2017 when SCCS received a call regarding L.G.'s living conditions.  Initially, SCCS attempted to work with appellant to keep L.G. with her, but when appellant was hospitalized SCCS removed L.G.  Appellant had been hospitalized from June 2017 until her release to a group home in October 2017.  However, within a month appellant returned to the state hospital and remained there until April 2018.

{¶16} After appellant secured appropriate housing, SCCS permitted visits with L.G. and also administered a December 2018 trial placement.  Approximately one month later, appellant's mental condition and living conditions again began to deteriorate.  Caseworker Kinsel testified that, after appellant accused her of

stealing her purse, Kinsel visited appellant's home to help her search for the purse and observed the deteriorating living conditions. Kinsel also testified that L.G. began to have problems in school "acting out in the classroom," and the agency transferred him to another school. Kinsel again visited appellant's home at the end of February and found it "in disarray. There were dirty clothes piling up in the bathroom. Dirty dishes all over, cups needed to be thrown away. The bedframe had been moved to the dining room. It had been broken down and there was a mattress that was also moved on there. [Appellant] also reported to me that day that her keys were missing and she knew that I had them. And, I did not * * * have any of her keys." Apparently, appellant blamed L.G. for the condition of the home. Further, appellant informed Kinsel that she had "a creeper in the house, either in the house or outside of the house, that was telling [L.G.] to do these things. * * * [S]he said that she heard the voices tell [L.G.] to tear up the paper in the house." On March 1, 2019, SCCS removed L.G. and returned him to the special needs home in which he had been placed in 2017. Kinsel explained that L.G. does well at the special needs home and that L.G. is nonverbal. "He can say some words sporadically," and understands prompts but cannot have a conversation. The foster family is "willing to keep him in their

home.  I'm not sure if they would ever adopt him or not, but they certainly don't want him placed anywhere else.  They want him to stay with them."

{¶17} Caseworker Kinsel further testified that, during appellant's visit with her son at McDonald's, appellant acted in a condescending manner and filed a complaint that alleged that Kinsel controlled L.G. via radio control.  Appellant also accused Kinsel of assaulting her and L.G. with a taser, and that SCCS used remote devices to control appellant and L.G.  Kinsel also recalled one visit when appellant told her that someone had broken into her home, manipulated her with medications and raped her.  Appellant also told Kinsel that neighbors sift through her trash and that SCCS stalks her.  Kinsel did acknowledge that appellant and L.G. have a strong parental bond, and that appellant is affectionate with L.G.

{¶18} On April 7, 2020, the permanent custody hearing continued and GAL Robert Johnson testified.  Johnson stated that he met with L.G. at least once at his mother's home, once at his foster family's home and that he had met with appellant several times. Johnson had concerns about appellant's "ability to distinguish reality from what I think are delusions, paranoid delusions." Johnson testified about experiences with appellant in which she

believes that others manipulate and control both her and L.G.

{¶19} V.G., appellant's mother, testified that, after she lived in North Carolina for two years, she returned to the area in September 2019. She last observed L.G. at the visit with appellant at McDonald's and he seemed subdued and "zombiish." V.G. testified that she returned to Scioto County because of North Carolina's high cost of living and that she also knew that appellant did not have custody of L.G.: "if I came back and she [appellant] was overwhelmed because an autistic child is more difficult to handle than a normal child. You have to have eyes on them continually and I thought I could help her out a little bit, give her a break now and then so she could rest or something." V.G. stated that she believed L.G. could be placed with appellant and that she is "there for her to fall back on if she needs me."

{¶20} Dustin Kesler, Case Manager at Ascend Counseling and Recovery, served as L.G.'s personal aide from October 2014 to February 2016. Kesler testified that L.G. is in a better mood when with his grandmother and appellant than when he is in foster care.

{¶21} Appellant testified that she did her best to raise L.G. and to provide for his needs. Since SCCS removed L.G., there "have been a lot of home invasions, um, and toxins and their air. . ."

When asked if her house is in better condition, she replied, "I don't think anything's really changed. We improved the heating units and there have been more violations to the home." On cross examination, appellant testified about Caseworker Kinsel coming into her first grade classroom and:

> there was a manipulation in the classroom and the nineteen eighties government had issued, um, radio remote controls for children that were malbehaved. * * * IT was a new thing being passed around to all the classrooms, um, the state government was experimenting, um, privately, and um, anyway, Naomi, or whatever her name is, had left one of those little radio remote controls in the classroom and, um, one of these social workers had re-entered our classroom at some point with the malbehaved substitute teacher, used the radio, um, and, uh, infected my ear. At that same time a couple of malbehaved, older brunettes screamed at a high-pitch and ruined by inner ears, um, and uh, my inner brain. Um, so, that affected my memory, my focus and attention while we're eating, um, it affected my inner calculator. I couldn't do math problems in my head. I had to use paper. Um, and it also got to be a disability where I couldn't use inter-brain mental communication or praying. I had a hard time mentally focusing. Um, and so, at that point the government did recall all of those radio control gadgets. Um, they had them recalled. They were illegal that year and just within a few months of being issued.

{¶22} Appellant went on to explain that during her pregnancy, she received an "iron bomb" that poisoned her three times with toxins "by Mr. Bowman or his associates." Appellant also outlined "home invasions" when "court-placed lawyers" "play dirty and they do invade homes." Further, appellant testified that when L.G.

comes for an extended stay, a "listening device or microphone, um, to tell, the voice on there told [L.G.] to tear up some paper and [L.G.] continued to tear up paper. * * * Someone was actually, destroying this (inaudible) baby and putting his mother through a lot of pain." Appellant also described her neighbors: "the next door neighbor is a cold blooded, thieving, uh, murderer. Two doors down is a drug dealing murderer. Three doors down is a cold blooded freak. Across the way in the other, in the other is a coal black thug, criminal killer. I mean, it's a daily process." Appellant also claimed that Naomi (a caseworker),

> has been breaking through that lock, those locks, and have introduced, um, her presence in my house and has caused a mass hysteria in the neighborhood, among other social workers have done the same thing. Um, many people have invaded my home. People want to harm lovely young women that have no male around. It's common. * * * This is nothing new.

{¶23} Appellant described a summer 2018 incident that occurred after the court discharged her from the state hospital. Appellant stated that she observed an SCCS employee or foster parent strike her child, foster parent grab her phone and purse, verbally abuse appellant and her mother, but then state that "[i]t was all a cover-up." Appellant further alleged that during the McDonald's visit, SCCS tasered her. When L.G. visited appellant, she claimed that he "was sedated" and both manipulated and assaulted.

Appellant did acknowledge, however, that she informed the foster mother that she did not administer L.G.'s medications as prescribed.  Appellant testified that the reason she wants custody is:

> Love, education is a big issue.  I think CPS has failed his education beyond, beyond, beyond what I was working with him on.  So has ODE.  I'm not sure what all the coordinated activities of them between MH or ODE and CPS and DD and TCC and SOMC, and, * * * LEE, and, um, I'm not sure what all the coordination events have been against someone that's non-crime when professionals have prison sentences but it has been going on.

Also, appellant stated that the day before the hearing she heard "three or four different" voices in her home.

**{¶24}** On April 27, 2020, the trial court (1) awarded SCCS permanent custody of L.G.; (2) found that L.G. cannot be placed with either parent, or should not be placed with either parent, within a reasonable amount of time; and (3) determined that placing L.G. in appellee's permanent custody is in L.G.'s best interest. The court further determined that the relationship between L.G. and appellant is detrimental to the child, and that appellant's mental health disorder and struggle to differentiate "between reality and delusion" prevents her from appropriately caring for her child. Also, the court found that L.G. has been in appellee's temporary custody since June 7, 2017.  Thus, the trial court granted

appellee's request for L.G.'s permanent custody.  This appeal

followed.

I.

**{¶25}** In her sole assignment of error, appellant asserts that

the trial court's permanent custody decision is against the

manifest weight of the evidence.  In particular, appellant argues

that: (1) she had been stable for at least six months before she

regained custody of L.G., (2) SCCS should have given her more time

than one month with L.G., and (3) she, in essence, has completed

the case plan requirements.

Permanent Custody Principles

**{¶26}** In general, a parent has a "fundamental liberty interest"

in the care, custody, and management of his or her child and an

"essential" and "basic civil right" to raise his or her children.

*Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d

599 (1982).  A parent's rights, however, are not absolute.  *In re*

*D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11.

Rather, " 'it is plain that the natural rights of a parent * * *

are always subject to the ultimate welfare of the child, which is

the polestar or controlling principle to be observed.' " *In re*

*Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting

*In re R.J.C.,* 300 So.2d 54, 58 (Fla.App. 1974); *accord In re B.S.,*
4th Dist. Jackson No. 19CA6, 2019-Ohio-4143, ¶ 41.

## Standard of Review

**{¶27}** A reviewing court generally will not disturb a trial
court's permanent custody decision unless the decision is against
the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588,
997 N.E.2d 169, ¶ 53 (4th Dist.); *In re T.J.*, 4th Dist. Highland
Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 25; *In re I.W.,* 4th Dist.
Pike No. 19CA902, 2020-Ohio-3112, ¶ 18. When an appellate court
reviews whether a trial court's permanent custody decision is
against the manifest weight of the evidence, the court " ' weighs
the evidence and all reasonable inferences, considers the
credibility of the witnesses and determines whether in resolving
conflicts in the evidence, the [finder of fact] clearly lost its
way and created such a manifest miscarriage of justice that the
[judgment] must be reversed and a new trial ordered.' " *Eastley v.
Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20,
quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176
(9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380,
387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d
172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶28} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 32. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55; *In re K.M.*, 4th Dist. Highland No. 20CA4 & 20CA6, 2020-Ohio-4476, ¶ 38.

{¶29} When reviewing evidence under this standard, appellate courts generally defer to a trial court's determination of credibility matters, which are crucial in these cases when a written record may not adequately reflect a witness's demeanor and attitude. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). A reviewing court should find a trial

court's permanent custody decision against the manifest weight of the evidence only in the " ' exceptional case in which the evidence weighs heavily against the decision.' " *Id.*, quoting *Martin* at 175, 485 N.E.2d 717.

## Statutory Framework

{¶30} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, appellee sought permanent custody of the child under a R.C. 2151.413 motion. When an agency files a R.C. 2151.413 permanent custody motion, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶31} R.C. 2151.414(B)(1) provides that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the conditions in R.C. 2151.414(B)(1)(a)-(e) apply.

{¶32} In the case sub judice, the trial court found that L.G. has been in appellee's temporary custody for more than 12 months of a consecutive 22-month period. Thus, R.C. 2151.414(B)(1)(d)

applies. Because appellant does not challenge the trial court's R.C. 2151.414(B)(1)(d) finding, we do not address it.

{¶33} The trial court also thoroughly addressed R.C. 2151.414(D)'s best-interest framework. To determine the best interest of a child at a hearing held pursuant to division (A) of this section of the Revised Code, R.C. 4151.414(D)(1) instructs courts to consider all relevant factors, including, but not limited to:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) Custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-month period ending on or after March 18, 1999;
>
> (d) The child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶34} Consequently, R.C. 2151.414(D)(1) requires a court "to consider 'all relevant factors,' including five enumerated

statutory factors * * * No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 6.

{¶35} In applying the R.C. 2151.414(D)(1) factors, the trial court in the case at bar found that it is in the child's best interests to terminate appellant's parental rights for the following reasons:

{¶36} As for the R.C. 2151.414(D)(1)(a) "the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child," the trial court determined that appellant's relationship with L.G. is detrimental to the child. While the court readily acknowledged appellant's love for her son and her desire to love and care for him, the court questioned appellant's ability to care for her child. The court stated that (1) the "testimony presented is uncontroverted that [appellant] suffers from a mental health disorder," (2) appellant acknowledged that she did not administer her son's prescribed medications because she disagrees with them, and (3) appellant believes that she knows more about her mental health conditions than any of her physicians. The court concluded

that appellant's bipolar disorder causes her to struggle "with differentiating between reality and delusion" and "these delusions will at times prevent [appellant] from appropriately caring for her child."

{¶37} The trial court also noted that L.G's relationship with his father is non-existent, a word used by L.G.'s father who admits to not having seen L.G. since he was approximately four years old. The court indicated that L.G.'s father testified that he recognizes that he is not in a position to care for L.G. and that L.G. is better served in the permanent custody of SCCS. Finally, the court recognized that L.G. appears to be well-cared for and content in his foster home, and although the foster family "may not wish to adopt [L.G.], they do wish to keep him in their home."

{¶38} As for the R.C. 2151.414(D)(1)(b) "wishes of the child," the trial court indicated that it did not conduct an in-camera interview due to "the child's diagnosis of autism and testimony from multiple witnesses that the child is non-verbal and severely limited in his ability to communicate." The court noted that appellant also agreed that such an interview would be futile. The court did, however, receive input concerning the child's wishes from the GAL report.

{¶39} For the R.C. 2151.414(D)(1)(c) factor concerning the child's "custodial history," the court determined that:

>  the child has been involved with or in the custody of CSB on multiple occasions since September 2010. He has been removed by parental agreement with CSB on multiple occasions; he has been placed in the temporary custody of the agency with legal custody ultimately being vested with his maternal grandmother; temporary custody has been awarded to CSB with custody of the child being returned to his mother; ultimately resulting in his removal in June 2017 and his temporary custody remaining with CSB.

{¶40} As for the R.C. 2151.414(D)(1)(d) "need for a legally secure permanent placement" and the ability to achieve placement without a grant of permanent custody to the agency, the court found:

>  [T]he Court has no doubt of the love of this mother for her child. However, it is abundantly clear that Ms. G[.....] cannot care for this child. It is clear from her own testimony that Ms. G[.....] suffers from frequent delusions. Ms. G[.....] has testified that she heard 3 or 4 voices telling her things as recently as the day before the hearing. She has testified that she has heard voices telling her son to do things. She rationalized [L.G.]'s behavior based on hearing these voices. On the one hand she displays delusions of grandeur as illustrated by her comments that [L.G.] 'has acquired much more academic skill from her than any other teacher' and that she 'thinks she understands more about her mental health than any of her doctors can comprehend.' But on the other, she displays paranoid delusions as evidenced by her statements that the government has placed radio devices in classrooms to control students; that she has been drugged and raped; that others have broken into her home on multiple occasions; and her focus on Ms. Kinsel and accusing Ms. Kinsel of stealing from her and assaulting her. The Court is of the opinion that

although Ms. G[.....] may not deliberately harm her child, it isn't difficult to envision a time or occasion where her delusions cause her to act out toward her son. She has already withheld medication from him, because she did not think it necessary that he have it.

**{¶41}** Finally, concerning R.C. 2151.414(D)(1)(e) and whether any factor in divisions (E)(7) to (11) apply in relation to the parents and to the child, the trial court found that R.C. 2151.414(E)(8) "may apply in that [appellant] has withheld medical treatment, in the form of medication, from the child and not for treatment by spiritual means through prayer alone or in accordance with the tenets of a recognized religious body." After a thorough review of the testimony, the trial court determined that the appellant's parental rights termination is in the child's best interest.

**{¶42}** Appellant does not dispute L.G.'s temporary custody for 12 of 22 months, so we do not address it. However, appellant contends that (1) the trial court erred in finding that permanent custody is in the child's best interest, (2) the trial court "simply blamed mother's mental health" and granted the permanent custody motion without a meaningful analysis of the best interest of the child factors, and (3) the "real obstacle between Appellant and her son was Scioto County Children Services Board and an irritated caseworker." Further, appellant argues that although her

initial hospitalization and deplorable home conditions formed the genesis of L.G.'s removal, at the time of the permanent custody hearing she "was no longer institutionalized, was maintaining a stable and cleaner home, and would have been able to care for her son again if given the chance."

{¶43} Our review of the record reveals the long-standing issues in this case and SCCS multiple attempts to reunite this family. As appellee points out, the child has been in SCCS's care on seven different occasions. After appellant's hospitalization, SCCS returned L.G. to appellant for an extended visit to determine whether appellant could safely care for the child. However, the child's condition, appellant's mental condition, and their living conditions rapidly deteriorated. Moreover, L.G.'s caseworker and the GAL testified about multiple instances of appellant's inability to distinguish reality from delusion. Finally, and sadly, appellant's own testimony supported the trial court's conclusion concerning appellant's inability to distinguish reality from delusion and to properly care for her child.

{¶44} Consequently, after our review, we agree with the trial court's conclusion that clear and convincing evidence supports the finding that the child should not be placed with appellant. The conditions that led to the child's removal included appellant's

serious mental health issues, appellant's inability to maintain a safe, stable, and permanent home, and appellant's bipolar disorder and hospitalization.  SCCS became involved when L.G.'s safety was in jeopardy and, although appellant's condition improved sufficiently to be released from hospitalization, she believed that she knows more about her condition than her physicians, and that she continues to suffer from multiple paranoid delusions.  A reading of appellant's testimony reveals rambling and stark examples of paranoia and delusions.  Appellant accused SCCS staff members, foster parents, and others of manipulating her, stealing from her, and harming her and her son.  *See In re S.C.*, 9th Dist. Summit No. 27676, 2015-Ohio-2623, ¶ 41 (mother's delusions and paranoia contributed to trial court granting permanent custody to agency); *In re D.G.,* __ N.E.3d __, 2021-Ohio-429 (1st Dist.), ¶ 19 (given extensive evidence of mother's delusional behavior and demonstrated impact on her ability to provide a stable and secure environment for child, trial court's decision to award permanent custody affirmed).

**{¶45}** As the trial court and appellee both candidly agree, appellant's love for her son is unquestionable.  However, we agree with the trial court that clear and convincing evidence exists to support the view that appellant's chronic mental illness and

delusions render her unable to appropriately care for her son, and to provide an adequate permanent home.  Consequently, after our review in the case sub judice, we agree with the trial court's conclusion that appellee adduced ample competent, credible clear and convincing evidence to support the determination that a permanent custody award is warranted and in the child's best interest.

{¶46} Accordingly, based upon the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

SCIOTO, 20CA3928

It is ordered that the judgment be affirmed. Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
        Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.

SCIOTO, 20CA3928

TOPICS & ISSUES

Permanent custody–trial court's decision to award children services agency permanent custody of child not against the manifest weight of the evidence when mother's chronic mental illness and delusions render her unable to care for her son.